IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. TRAVIS WAYNE ENDSLEY, Defendant. | Case No.: 3:21-cr-00058-TMB-MMS-1<br><br>**ORDER ON MOTION TO SUPPRESS (DKT. 71)** |

This matter comes before the Court on the Final Report and Recommendation ("R&R" or "Final R&R") of the Chief Magistrate Judge, recommending the Court deny Defendant Travis Wayne Endsley's Motion to Suppress at Docket 71 (the "Motion").[1] Endsley objects to the R&R; the Government filed neither its own objections to the R&R nor a response to Endsley's objections.[2] Pursuant to 28 U.S.C. § 636, the Court has reviewed the parties' relevant filings, the record, and the R&R. For the following reasons, the Court **ACCEPTS and ADOPTS with modifications** the R&R at Docket 163; accordingly, the Motion at Docket 71 is **GRANTED in part and DENIED in part**.

I. BACKGROUND

Because the parties raise no material factual disputes, the Court adopts the facts found and thoroughly detailed by the Magistrate Judge.[3] Although the Court will not repeat these facts in the

---

[1] Dkt. 163 (Final R&R).
[2] Dkt. 154 (Objections).
[3] *See* Dkt. 148 at 3–10 (Initial R&R); *see also* 28 U.S.C. § 636(b)(1)(C); *see also United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) ("[T]he district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise.") (en banc).

1

same degree of detail, it summarizes the factual background and procedural history of this case to contextualize Endsley's objections.

### A. Factual Background

In May 2021, Endsley was indicted in federal court on charges of possessing stolen firearms[4] and possessing firearms while being an unlawful user of controlled substances.[5] These charges stemmed from an investigation into Endsley that began after he was captured on video stealing a nail gun from Home Depot on January 23, 2020.[6]

On January 31, 2020, Sergeant Jay Sjogren of the Kenai Police Department ("KPD") applied for a warrant to search Endsley's "residence, garage(s), and all outbuildings and vehicles located on the premises" at 33200 Rensselaer Lane in Soldotna in connection with the alleged nail gun theft.[7] In preparing to execute the search warrant, the Alaska State Troopers ("AST") devised an "Operation Plan."[8] The Operation Plan noted that law enforcement suspected Endsley was trafficking controlled substances and "stolen firearms," and had information that he "possessed" these firearms and was always "armed," with "access to automatic rifles and night vision."[9] The Operation Plan further commented that the three other occupants of the home—Endsley's parents and girlfriend—had knowledge of the "illegal activities occurring at the property."[10] In addition, the Operation Plan contained a "tactical plan" explaining how law enforcement was going to execute the search warrant, including by searching "[a]ll occupants of the home" for weapons.[11]

---

[4] Dkt. 2 (Indictment); 18 U.S.C. §§ 922(j), 924(a)(2).
[5] Dkt. 2; 18 U.S.C. §§ 922(g)(3), 924(a)(2).
[6] Dkt. 148 at 4.
[7] *Id.* at 5; Dkt. 71-2 at 2 (Search Warrant No. 3KN-20-21SW); *see also* AS 11.46.140(a)(1) (Theft in the Third Degree).
[8] Dkt. 71-3 at 5 (Operation Plan).
[9] *Id.* at 3.
[10] *Id.*
[11] *Id.* at 4.

Finally, the Operation Plan stated that "[i]f controlled substances, bulk currency, or firearms [were] located[,] the search w[ould] be suspended" until a new search warrant could be obtained.[12]

On February 6, 2020, a magistrate judge granted the search warrant application and KPD executed the warrant with assistance from various state and federal law enforcement officers.[13] The search team contacted Endsley, his father, and his girlfriend in the home.[14] The search team handcuffed Endsley, who denied possessing any weapons but said that he had an "unloaded" and "capped" syringe in his front shirt pocket.[15] A few minutes later, the officers escorted Endsley to a patrol vehicle; before placing Endsley into the back of the vehicle, they noted that they had to search his person because "he [had] at least one needle in his pocket."[16] At the start of the pat-down, Sergeant Ryan Coleman of KPD asked Endsley, "Just the one point, you said?"[17] Endsley responded, "Yes."[18] Sergeant Coleman extracted that syringe from Endsley's pocket and then continued to pat down Endsley's person, extracting various items from his pockets, including Endsley's wallet, a pack of cigarettes, and a round blue container containing small amounts of cocaine and heroin.[19] After completing the pat-down, the officers placed Endsley into the back of the patrol vehicle.[20]

The search team next conducted preliminary and secondary sweeps of the home.[21] During these sweeps, law enforcement observed a "whole shitload of guns" and some drug paraphernalia,

---

[12] *Id.* at 1, 4.
[13] Dkt. 148 at 4–6; Dkt. 71-3 at 6 (Alaska State Trooper Action Plan for Search Warrant 3KN-20-0021SW).
[14] Dkt. 148 at 6; Dkt. 83-1 at 2:50–3:30.
[15] Dkt. 148 at 7; Dkt. 83-1 at 0:41–1:05.
[16] Dkt. 83-1 at 4:00–4:05.
[17] *Id.* at 4:00–18.
[18] *Id.* at 4:18–20.
[19] *Id.* at 4:30–5:50.
[20] *Id.* at 6:00–35.
[21] Dkt. 148 at 7–8.

including a meth pipe, needles, and scales, in plain view.[22] While sweeping the "shop" in the garage, law enforcement concluded that they would need another search warrant; consistent with the Operation Plan, they decided to "pull back."[23]

While the search team prepared an application for a second search warrant, Sergeant Casey Hershberger of AST interrogated Endsley, who was still handcuffed and in the back of a patrol vehicle.[24] Before questioning Endsley, Sergeant Hershberger read him his *Miranda* rights.[25] Endsley affirmed that he understood his rights.[26] At the start of the interrogation, Endsley admitted to stealing the nail gun from Home Depot the month before.[27] Sergeant Hershberger then observed that, based on his appearance and demeanor, Endsley seemed to be a "user" or a "drug addict"; when asked about any current drug use, Endsley acknowledged ingesting "half a gram a day [of] heroin and meth."[28] Endsley also denied that he was a large-scale drug trafficker, though he acknowledged "hook[ing] up" two people "every once and a while . . . to supplement . . . [his] investment or [his] buy" or "to source [his] own drugs."[29] Endsley further admitted to having traded a quarter gram of controlled substances for "one or two" stolen firearms.[30]

While Sergeant Hershberger interrogated Endsley, other members of the search team prepared an application for a second search warrant to search for evidence of sales or distribution of controlled substances and the proceeds of any such sales.[31] In support of this application,

---

[22] *Id.*
[23] *Id.* at 8.
[24] *Id.* at 8–9.
[25] *Id.* at 9.
[26] *Id.*
[27] *Id.*
[28] *Id.* at 10; Dkt. 83-1 at 18:30–19:30.
[29] *Id.*
[30] *Id.*
[31] Dkt. 71-5 (Search Warrant 3AN-20-00468); *see also* AS 11.46.130(a)(1) (Misconduct Involving a Controlled Substance); AS 11.46.130(a)(1) (Theft in the Second Degree).

4

Sergeant Sjogren submitted a revised affidavit, which added descriptions of the firearms and drug paraphernalia observed during the initial sweeps of the home.[32] The affidavit also indicated that Endsley "was found to have methamphetamine, heroin, and suspected cocaine" on his person.[33] In addition, the affidavit referenced some of the statements Endsley made during his interrogation, characterizing what he said as "admitt[ing] to taking in stolen firearms and power tools in trade / exchange for controlled substances."[34] A magistrate judge granted this second search warrant application that evening.[35] The search of the property yielded approximately 50 firearms and drug paraphernalia, among other things, but did not appear to yield any controlled substances.[36]

### B. Procedural History

In July 2022, Endsley filed the Motion, requesting suppression of all evidence from (1) the execution of two search warrants, (2) the pat-down of his person, and (3) his custodial interrogation.[37] Endsley cited numerous bases for suppression: that (1) the execution of the first search warrant was unreasonable because it "was a pre-text to search for drugs"; (2) the facts supporting probable cause for the first search warrant were stale because two weeks had passed before law enforcement obtained a search warrant for the stolen nail gun; (3) law enforcement

---

[32] Dkt. 71-5 at 12–13.
[33] *Id.* at 13.
[34] *Id.*
[35] *Id.* at 4.
[36] Dkt. 148 at 10; Dkt. 71-5 at 5–9. The Court notes that law enforcement's inventory of property seized while executing the search warrant included suspected heroin, cocaine, mushrooms, suboxone strips, and marijuana. *See* Dkt. 71-5 at 4–9. Furthermore, the Government contends that the search produced "6.8 grams of cocaine, Alprazolam, Diazepam, . . . MDMA pills, 28.6 grams of suspected psilocybin mushrooms, and 17 ounces of cannabis." Dkt. 83 at 7. However, because the record does not clearly indicate that these controlled substances were in fact seized, and because the Government did not object to the Magistrate Judge's finding that "[t]he only controlled substances on the property" were the small amounts of heroin and cocaine inside Endsley's pocket, the Court does not disturb this finding. *See* Dkt. 148 at 10.
[37] Dkt. 71.

lacked "legal authority" to stop or detain him; (4) law enforcement lacked specific and articulable facts supporting a reasonable belief that he might be armed and presently dangerous such that they could conduct a limited search of his person pursuant to *Terry v. Ohio*;[38] (5) law enforcement lacked specific and articulable facts to indicate a danger justifying the initial sweeps; (6) the firearms and certain drug paraphernalia observed during the initial sweeps were not clearly contraband; (7) his interrogation was both coerced and tainted by the allegedly invalid first search warrant; and (9) the evidence law enforcement relied on to support the second search warrant—including the controlled substances found on his person and the statements he made during his interrogation—was tainted by the allegedly invalid first search warrant and interrogation.[39]

In August 2022, the Government filed a Response in opposition to the Motion.[40] In general, the Government maintained that both search warrants were properly supported by probable cause and lawfully executed by law enforcement.[41] Thus, the Government reasoned, any pretextual motives to the first search would not taint the evidence observed in plain view and seized pursuant to the second search warrant.[42] As to the first search warrant, the Government contested Endsley's argument that the facts supporting probable cause were stale, arguing that law enforcement reasonably concluded that Endsley was still harboring the stolen nail gun at his property.[43] Furthermore, the Government contended that even if the first search warrant were not supported by probable cause, suppression would be inappropriate because "the officers were entitled to rely in good faith on a facially valid warrant."[44]

---

[38] 392 U.S. 1 (1968).
[39] Dkt. 71 at 5–18.
[40] Dkt. 83 (Response).
[41] *Id.* at 7–14, 21–23.
[42] *Id.* at 17–18.
[43] *Id.* at 8–10.
[44] *Id.* at 10–12.

6

The Government then argued that Endsley's detention was reasonable because "the search team had independent information that [he] was a drug trafficker and had access to multiple automatic rifles" on the property.[45] Similarly, the Government asserted that the initial sweeps were reasonable because the officers had a search warrant that broadly "permitted [them] to conduct a search of the premises in a safe and thorough manner."[46] In addition, the Government maintained that Endsley knowingly waived his right to remain silent and that the statements he subsequently made to law enforcement were voluntary, not coerced.[47] Finally, the Government argued that the second search warrant contained facts supporting "ample probable cause," even without considering Endsley's statements or the evidence found in his pockets.[48] Noting that it was "yet unclear" whether Endsley's pat-down and ensuing seizure of contraband in his pockets violated the Fourth Amendment, the Government requested an evidentiary hearing on this issue.[49]

In May 2023, after holding two evidentiary hearings and oral argument,[50] the Magistrate Judge issued an Initial R&R recommending that the Court deny the Motion.[51] In the Initial R&R, the Magistrate Judge rejected all of Endsley's arguments for suppression, concluding that: (1) even assuming that the evidence supporting the first search warrant was stale, that search warrant was still supported by probable cause because Sergeant Sjogren's affidavit established a "fair probability" that Endsley had stolen the nail gun and thus committed the theft offense with which he had been charged; (2) Endsley's detention was constitutionally permissible in light of law enforcement's interests in maintaining officer safety, facilitating the completion of the search, and

---

[45] *Id.* at 13–14.
[46] *Id.* at 16.
[47] *Id.* at 18–21.
[48] *Id.* at 21–23.
[49] *Id.* at 14–15.
[50] *See* Dkt. 91 (Minute Entry); Dkt. 125 (Minute Entry).
[51] Dkt. 148 (Initial R&R).

7

preventing his and others' flight; (3) the search of Endsley's person was justified by officers' reasonable suspicion that he might be armed and presently dangerous, given the information they had about Endsley's suspected trafficking in controlled substances and stolen firearms and his tendency to "always be armed," as well as his statement that he had a syringe in his pocket; (4) law enforcement lawfully conducted the initial sweeps of Endsley's home because the first search warrant authorized them to do so without needing to justify these sweeps with a reasonable fear of danger; and (5) Endsley's statements made during his custodial interrogation were voluntary.[52]

Endsley then filed objections to the Initial R&R, arguing that the Magistrate Judge made three "foundational errors" in his analysis.[53] First, Endsley contends that the search of his person was not justified because even though law enforcement had information that he had "access to automatic firearms," they did not have information that he might be "armed at home."[54] Endsley maintains that the *Terry* search was also unlawful because the information available to law enforcement indicated only that he "had access" to automatic rifles, as opposed to "possessing" firearms that can be concealed on one's person.[55] Second, Endsley argues that law enforcement's withdrawal of items in his pocket after the *Terry* search was unjustified.[56] And third, Endsley argues that if he is correct that the *Terry* search and subsequent seizure of contraband from his pocket were unlawful, then the Court should also hold that the second search warrant was impermissibly tainted by those actions.[57] The Government did not respond to Endsley's objections.

---

[52] *Id.* at 11–26.
[53] Dkt. 154.
[54] *Id.* at 2.
[55] *Id.* at 2–3.
[56] *Id.* at 3–4.
[57] *Id.* at 4.

In July 2023, the Magistrate Judge issued the Final R&R, which recommends rejecting Endsley's objections.[58] The Magistrate Judge describes these objections as, in general, "largely reiterat[ing] his prior arguments" and "highlight[ing] specific, isolated facts disconnected from the greater context."[59] More specifically, the Magistrate Judge explains that: (1) Endsley's *Terry* search was justified because law enforcement reasonably believed he might have a weapon on his person during his arrest, based on information that he possessed "unspecified stolen firearms [and] controlled substances" with access to automatic and potentially concealable firearms; (2) law enforcement properly removed the syringe from Endsley's pocket after identifying it as contraband during his initial pat-down; and (3) Endsley's argument that the second search warrant was tainted need not be addressed because they rely on the incorrect premise that the initial *Terry* search and the subsequent search of his pockets were unlawful.[60] Accordingly, the Magistrate Judge again recommends denying the Motion.[61]

## II. LEGAL STANDARD

When a magistrate judge issues a report containing a recommended disposition of a matter, "[a] judge of the [district] court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.'"[62] The district judge "may accept, reject, or modify [the recommendation], in whole or in part . . . ."[63] Where no objection has been made, arguments challenging a recommendation are deemed waived.[64]

---

[58] Dkt. 163.
[59] *Id.* at 3–4.
[60] *Id.* at 3–9.
[61] *Id.* at 9.
[62] *Thomas v. Arn*, 474 U.S. 140, 149–50 (1985) (quoting 28 U.S.C. § 636(b)(1)) (internal quotation marks omitted); *see also* Fed. R. Crim. P. 59(b)(3).
[63] 28 U.S.C. § 636(b)(1)(C).
[64] *See id.*; *Reyna-Tapia*, 328 F.3d at 1121–22 ("[T]he district judge must review the magistrate judge's findings and recommendations *de novo* if objection is made, but not otherwise." (emphasis removed)).

### III. DISCUSSION

After a careful *de novo* review of the R&R, the parties' objections, and the record, the Court agrees with the Magistrate Judge's recommendation to deny the Motion. The Court addresses each of Endsley's three objections in turn.

*A. The Search of Endsley's Person Did Not Violate* Terry

The Fourth Amendment guarantees the right of individuals to be secure in "their persons, houses, papers, and effects, against all unreasonable searches and seizures[.]"[65] Searches and seizures conducted without a warrant are "per se unreasonable under the Fourth Amendment" subject to "a few specifically established and well delineated exceptions."[66] One such exception to the warrant requirement is relevant here: under *Terry*, an officer may conduct a pat-down search without a warrant "[w]hen [the] officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others[.]"[67] The scope of a protective search performed under *Terry* is limited "to determin[ing] whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."[68] Accordingly, "[i]n connection with an otherwise lawful investigative detention under *Terry*, 'an officer may conduct a brief pat-down (or frisk) of an individual when the officer reasonably believes that the persons with whom he [or she] is dealing may be armed and presently dangerous.'"[69] This test is objective and asks "whether a reasonably prudent [officer] in the

---

[65] *Mapp v. Ohio*, 367 U.S. 643, 647 (1961).
[66] *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993).
[67] 392 U.S. at 24.
[68] *See id.* at 20, 24.
[69] *United States v. Brown*, 996 F.3d 998, 1007 (9th Cir. 2021) (quoting *United States v. I.E.V.*, 705 F.3d 430, 434 (9th Cir. 2012)) (internal quotation marks omitted).

circumstances would be warranted in the belief that his [or her] safety or that of others was in danger."[70]

Endsley objects to the Magistrate Judge's conclusion that his initial pat-down was not justified under *Terry*. First, he contends that although the officers had information that he "had access to automatic firearms," they did not have any information suggesting that he "was armed at home."[71] Second, Endsley asserts that law enforcement had information suggesting only that he had "access" to or "distribut[ed]" these weapons, not that he "possessed" them.[72] These words, Endsley argues, "simply mean[] that [he] could obtain [automatic firearms]" or that he "transfer[red]" firearms to others, not that he "possessed" them and thus posed a danger.[73] And third, Endsley asserts that the officers should have immediately known that he was not carrying any firearms on his person because the only firearms to which he had access were rifles, which "cannot be concealed."[74]

None of these arguments persuade the Court that the search team lacked a reasonable basis for carrying out the *Terry* search. As an initial matter, the Court agrees with the Magistrate Judge that Endsley ignores or mischaracterizes key context from the Operation Plan.[75] The Operation Plan stated that confidential informants had reported Endsley to be "in possession of . . . stolen . . . firearms," that an investigation "ha[d] determined [he was] suspected of distribut[ing] . . . heroin, methamphetamine, marijuana, and stolen firearms," and that reports had indicated that Endsley was "always . . . armed and ha[d] access to automatic rifles and night

---

[70] *Id.* (internal quotation marks omitted).
[71] Dkt. 154 at 2.
[72] *Id.*
[73] *Id.*
[74] *See id.* at 2–3.
[75] *See* Dkt. 163 at 5.

11

vision."[76] Taken together, this information is plainly sufficient to support a reasonable belief that Endsley might have been armed and dangerous at the time officers entered his home to execute the first search warrant.

Endsley points to no authority suggesting that—despite the evidence indicating that he was "always . . . armed" and that he possessed, distributed, or had access to firearms, with multiple reports that at least some of those firearms were stolen—the officers needed to have information specifically indicating that he might have been armed at home. In addition, even if Endsley were correct that the Operation Plan contained information indicating only that he had "access" to or "distribut[ed]" automatic firearms, these terms alone would not prevent a reasonable officer from concluding that Endsley presented a risk of being armed and dangerous at the time of the search. Endsley's argument that the officers should have known he was not armed because he was "obviously" not carrying a rifle on his person is similarly flawed. Even assuming that rifles are not concealable weapons, the Operation Plan's description of Endsley and his suspected activities broadly encompassed "firearms." Simply because the Operation Plan mentioned that Endsley had access to "automatic rifles" on top of possessing or trafficking "stolen firearms" does not mean that he could only have been armed with a rifle.

The Court therefore rejects Endsley's objection that the search of his person violated *Terry*.[77]

---

[76] Dkt. 71-3 at 3.
[77] Further, to the extent Endsley suggests that the officers unreasonably detained him before conducting the *Terry* search because "mere presence where a search warrant is conducted does not [indicate] that a person is engaged in crime," the Court disagrees. *See* Dkt. 154 at 2. Endsley fails to acknowledge that the first search warrant was based on his suspected theft of the nail gun—which was supported by video footage—and that the officers had received information that he was trafficking controlled substances and stolen firearms. *See* Dkt. 148 at 4.

12

B. *The Seizure of the Syringe Was Within the Scope of the* Terry *Search, But the Seizure of Other Items From Endsley's Pockets Was Not*

Endsley next objects to the Magistrate Judge's conclusion that Sergeant Coleman lawfully removed the syringe from his pocket after the initial pat-down.[78] Endsley maintains that after he alerted the officers to the syringe, one of the officers referred to the syringe as a "needle," even though "a syringe is not a needle" and poses little threat on its own.[79] Focusing on the distinction between these two terms, and arguing that the syringe would have felt similar to a pen, which is not contraband, Endsley argues that Sergeant Coleman's subsequent "intrusion into [his] pockets" exceeded the scope of what *Terry* permits.[80]

Under *Terry*, a warrantless protective search based on reasonable suspicion must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby."[81] The scope of a *Terry* search is confined to that "reasonably designed to discover guns, knives, clubs, or other hidden instruments" that could potentially be used to assault an officer.[82] However, an officer may seize contraband during an otherwise lawful *Terry* search if the item's "contour or mass makes its identity immediately apparent."[83] An officer may not seize contraband, on the other hand, when "'the incriminating character of [an item is] not immediately apparent' but is discovered 'only as a result of a further search.'"[84]

With this standard in mind, the Court agrees with the Magistrate Judge that the officers lawfully removed the syringe from Endsley's pocket. As discussed above, the Court has already

---

[78] Dkt. 154 at 3–4.
[79] *Id.*
[80] *Id.* at 4.
[81] *Terry*, 392 U.S. at 26.
[82] *Id.* at 29.
[83] *I.E.V.*, 705 F.3d at 440 (quoting *Dickerson*, 508 U.S. at 375) (internal quotation marks omitted).
[84] *Id.* (quoting *Dickerson*, 508 U.S. at 379) (alteration in original).

13

determined that the *Terry* search was justified by the officers' reason to believe Endsley could have been armed and dangerous. Endsley told the officers that he had a syringe in his pocket, and before Sergeant Coleman removed the syringe, he asked, "Just the one point, you said?" to which Endsley responded in the affirmative.[85] Sergeant Coleman then patted down the exterior of Endsley's breast pocket and, from there, briefly squeezed the syringe before removing it from the pocket.[86] Informed by Endsley's acknowledgement that he had a "point" in his pocket, this limited search was within the scope of *Terry*'s instruction that searches be "reasonably designed to discover . . . hidden instruments" that could potentially be used to assault an officer.[87]

However, the Court finds that the remainder of the pat-down exceeded the scope of *Terry*. After removing the syringe from Endsley's breast pocket, Sergeant Coleman proceeded to pat down Endsley's other pockets. Within one second of reaching Endsley's right front pants pocket, Sergeant Coleman used two fingers to squeeze a round blue container out of the pocket.[88] Although the container ultimately contained controlled substances, the Court is not persuaded that it was "immediately apparent" that it housed contraband. At the evidentiary hearing, Sergeant Coleman testified that when he felt the container, he "suspected that it m[ight] have contained narcotics" or a "cuff key."[89] This testimony indicates that Sergeant Coleman was not sure what the container might hold. Even though Sergeant Coleman's suspicions were ultimately confirmed, the container's shape did not clearly give away the incriminating nature of its contents. The removal

---

[85] Dkt. 83-1 at 4:10–20.
[86] *Id.* at 4:15–22.
[87] *Terry*, 392 U.S. at 29.
[88] Dkt. 83-1 at 4:50–57.
[89] Dkt. 107 at 15 (Transcript of Evidentiary Hearing).

of the container from Endsley's pocket therefore violated *Terry*, as did the subsequent removal of non-contraband items, including Endsley's phone, his wallet, and a pack of cigarettes.[90]

In sum, the Court rejects Endsley's objection that the seizure of the syringe violated *Terry*. But because the seizure of the other items from Endsley's pockets was unlawful, and because the Government does not argue that any other exception to the warrant requirement applies with respect to this evidence, the Court rules that all other items obtained during the *Terry* search are suppressed.

### C. The Second Search Warrant Was Supported by Probable Cause

Finally, Endsley notes that he "still stands by" his argument that the second search warrant was not supported by probable cause because it relied on evidence that was tainted from the *Terry* search.[91] The Magistrate Judge declined to address this point, noting that it was immaterial given his conclusion that the entirety of the *Terry* search was lawful.[92] Because the Court reaches a different conclusion with respect to a narrow portion of the *Terry* search, as discussed above, it will examine the validity of the second search warrant after excising the tainted evidence.

---

[90] *See I.E.V.*, 705 F.3d at 441–42 (holding that "because it is not obvious from the record that the officer immediately identified [a] bundle on the [d]efendant as contraband or a weapon, the search of the [d]efendant exceeded the scope of a constitutional *Terry* search" when the officer lifted the defendant's shirt to reveal marijuana); *United States v. Joshua,* 564 F. Supp. 3d 860, 876 (D. Alaska 2021) ("While the officers in this case might have been justified in searching [the defendant] for weapons, they were not justified in removing and seizing all items from [the defendant's] pockets regardless of whether they appeared to be weapons or other contraband. The actions of the officers exceeded the scope of a *Terry* stop."), *appeal dismissed*, No. 21-30215, 2021 WL 6751804 (9th Cir. Nov. 12, 2021)
[91] Dkt. 154 at 4; *see also* Dkt. 71 at 16–17.
[92] Dkt. 163 at 9 n.18.

"A search warrant [is not] rendered invalid merely because some of the evidence included in the [supporting] affidavit is tainted."[93] However, "evidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search."[94] Thus, when an affidavit contains evidence illegally obtained, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate [judge] with probable cause to issue a warrant."[95] Probable cause exists where, considering the totality of the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place."[96]

Here, after excising the sole sentence pertaining to the tainted evidence obtained from Endsley's pockets,[97] the Court finds Sergeant Sjogren's revised affidavit still establishes probable cause to search Endsley's residence for evidence of drug trafficking. The affidavit relies on the voluntary statements Endsley made during his interrogation, including his admission to "taking in stolen firearms and power tools in trade / exchange for controlled substances."[98] The affidavit further notes the search team's plain-view observation during the initial sweeps of "multiple firearms . . . as well as scales, pipes and jars full of marijuana[,] . . . lots of power tools, . . . [and] tinfoil with burnt residue on it."[99] The affidavit also describes a tip given to law enforcement that

---

[93] *United States v. Nora*, 765 F.3d 1049, 1058 (9th Cir. 2014) (explaining that a search warrant supported by an affidavit that includes some tainted evidence "remains valid if, after excising the tainted evidence, the affidavit's remaining untainted evidence would provide a neutral magistrate with probable cause to issue a warrant" (quoting *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994) (internal quotation marks omitted)).
[94] *United States v. Barajas-Avalos*, 377 F.3d 1040, 1054 (9th Cir. 2004).
[95] *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987) (citation omitted).
[96] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).
[97] *See* Dkt. 71-5 at 13 (providing that "Sgt. Sjogen was informed that [Endsley] was found to have methamphetamine, heroin, and suspected cocaine (A white powdery substance) on his person.").
[98] *Id.* Endsley does not object to the Magistrate Judge's conclusion that these statements were voluntary.
[99] *Id.*

16

Endsley was in possession of custom milled lumber that he had received in exchange for controlled substances and was hiding the lumber in the residence's garage.[100] All this information would provide a neutral magistrate judge with probable cause to issue a search warrant.

Therefore, the Court rejects Endsley's objection that the second search warrant was not supported by probable cause.

## IV. CONCLUSION

For the foregoing reasons, the Court **ACCEPTS and ADOPTS with modifications** the R&R at Docket 163. Accordingly, the Motion at Docket 71 is **GRANTED in part and DENIED in part**.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 20th day of September, 2023.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[100] *Id.*