IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>  v.<br><br>TRAVIS WAYNE ENDSLEY,<br><br>           Defendant. | Case No.: 3:21-cr-00058-TMB-MMS-1<br><br>**ORDER ON MOTION TO DISMISS**<br>**(DKT. 84)** |

  This matter comes before the Court on the Final Report and Recommendation ("R&R") of the Chief Magistrate Judge, recommending the Court deny Defendant Travis Wayne Endsley's Motion to Dismiss Count 1 at Docket 84 (the "Motion").[1] Endsley objects to the R&R;[2] the Government filed a response to Endsley's objections.[3] Pursuant to 28 U.S.C. § 636, the Court has reviewed the parties' relevant filings, the record, and the R&R.[4] For the following reasons, the Court **ACCEPTS and ADOPTS** the R&R at Docket 154; accordingly, the Motion at Docket 84 is **DENIED**.

## I. BACKGROUND

*A. Background*

  In May 2021, Endsley was indicted by grand jury on charges of Possession of Firearms by an Unlawful User of Controlled Substance, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2)

---

[1] Dkt. 154 (Final R&R).
[2] Dkt. 160 (Defense Objections).
[3] Dkt. 164 (Government Response to Objections).
[4] *See* 28 U.S.C. § 636(b)(1)(C) ("Within fourteen days after being served with a copy [of the magistrate judge's R&R], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge.").

1

(Count 1), and Possession of Stolen Firearms, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2).[5] With respect to Count 1, the Indictment alleges that in February 2020, Endsley knowingly possessed 37 firearms while being a knowing and unlawful user of a controlled substance.[6]

After Endsley's indictment, the Supreme Court issued a decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*.[7] *Bruen* sets forth a two-part test that courts must apply when assessing whether a firearm regulation comports with the Second Amendment to the United States Constitution. This framework "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."[8] Courts must first determine whether "the Second Amendment's plain text covers an individual's conduct."[9] If it does not, then the regulation is valid and the analysis ends there. But if the Second Amendment's text covers the conduct at issue, then the conduct is "presumptively protect[ed]."[10] Courts must then determine whether the government has met its burden to "justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation."[11] "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's [protection]."[12]

Following *Bruen*, Endsley moved to dismiss Count 1 of the Indictment, arguing that § 922(g)(3)'s prohibition on possession of firearms by unlawful drug users violates the Second

---

[5] Dkt. 2 (Indictment).
[6] *Id.* at 2–4. The facts underlying the Indictment are set out in the Magistrate Judge's Initial Report and Recommendation on Endsley's Motion to Suppress at Docket 148 and the Court's Order on the Motion to Suppress at Docket 165.
[7] Dkt. 24 at 7; 597 U.S. —, 142 S. Ct. 2111 (2022).
[8] *Bruen*, 142 S. Ct. at 2131.
[9] *Id.* at 2126.
[10] *Id.* at 2130.
[11] *Id.*
[12] *Id.* at 2126.

Amendment as applied to his conduct.[13] In the Motion, Endsley argued that he is part of "the people" whom the Second Amendment covers, and that § 922(g)(3) has no meaningful historical analogue.[14] Thus, Endsley asserted, § 922(g)(3) is unconstitutional as applied.[15]

The Government opposed, arguing that the Second Amendment guarantees the right to possess firearms only to individuals who are "law-abiding" and "responsible" and that "those who habitually, unlawfully use controlled substances" like Endsley do not meet these criteria.[16] Turning to *Bruen*'s second step, the Government asserted that even if Endsley does enjoy Second Amendment rights as an unlawful user of controlled substances, § 922(g)(3)'s prohibition on firearm possession by individuals convicted of domestic violence misdemeanors is "consistent with this Nation's historical tradition of firearm regulation."[17] In support, the Government identified three potential historical analogues to § 922(g)(9): regulations disarming (1) felons; (2) groups of people "deemed to be dangerous or untrustworthy," such as slaves, Native Americans, and those unwilling to swear oaths of allegiance to the colonies; and (3) the mentally ill.[18] Therefore, according to the Government, § 922(g)(3) is constitutional.[19]

---

[13] Dkt. 84; *see also* Fed. R. Crim. P. 12(b) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."); *United States v. Mayer*, 503 F.3d 740, 747 (9th Cir. 2007) (noting that dismissal of a criminal charge is appropriate when the charge is based on "a statute that is unconstitutional on its face or as applied") (citation omitted)).
[14] Dkt. 84 at 6–10.
[15] *Id.* at 11. Endsley later filed two notices of supplemental authority directing the Court's attention to three recent, out-of-circuit decisions that could assist in ruling on the Motion: *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023); *United States v. Harrison*, No. CR-22-00328-PRW, — F. Supp. 3d —, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023); and *United States v. Connelly*, No. EP-22-CR-229(2)-KC, — F. Supp. 3d —, 2023 WL 2806324 (W.D. Tex. Apr. 6, 2023). Dkt. 115 (First Notice); Dkt. 134 (Second Notice).
[16] Dkt. 86 at 7–10.
[17] *Id.* at 10.
[18] *Id.* at 14–19.
[19] *Id.* at 20.

3

The Magistrate Judge heard oral argument and subsequently issued an R&R recommending that the Court deny the Motion.[20] At the first step of the *Bruen* inquiry, the Magistrate Judge rejects the Government's argument that Endsley is not among "the people" who enjoy Second Amendment rights and concludes that the plain text of the Second Amendment presumptively covers his conduct.[21] Turning to *Bruen*'s second question, the Magistrate Judge compares § 922(g)(3)'s disarmament of Endsley with the founding-era disarmament of the mentally ill based on shared key features.[22] In particular, the Magistrate Judge notes that so-called "lunatics," defined in the founding era as those who had "lost the use of [their] reason," were committed to civil confinement or made wards of the State when they were deemed sufficiently dangerous.[23] These individuals could reclaim property deprived as a result of their confinement after showing "restored reason."[24] The Magistrate Judge finds that the effects of Endsley's "daily use of mind-altering substances [are] . . . comparable" to what was seen as a recoverable loss of reason due to mental illness that could warrant disarmament in the founding era.[25] Because founding-era disarmament of the mentally ill who were deemed sufficiently dangerous is a proper historical analogue to § 922(g)(3), the Magistrate Judge concludes, the statute is constitutional as applied to Endsley.[26]

## II. LEGAL STANDARD

When a magistrate judge issues a report containing a recommended disposition of a matter, "[a] judge of the [district] court shall make a *de novo* determination of those portions of the report

---

[20] Dkt. 91 (Minute Entry); Dkt. 154.
[21] Dkt. 154 at 18.
[22] *Id.* at 27–31.
[23] *Id.* at 27–28.
[24] *Id.* at 28.
[25] *Id.* at 30.
[26] *Id.* at 31.

or specified proposed findings or recommendations to which objection is made.'"[27] The district judge "may accept, reject, or modify [the recommendation], in whole or in part . . . ."[28] Where no objection has been made, arguments challenging a recommendation are deemed waived.[29]

### III. DISCUSSION

Endsley objects to the R&R on three grounds, arguing that the Magistrate Judge: (1) inappropriately relied on pre-*Bruen* Supreme Court dicta to support the conclusion that § 922(g)(3) is consistent with this Nation's tradition of firearm regulation; (2) improperly concluded that § 922(g)(3) resembles the historical disarmament of the mentally ill even though that disarmament was only temporary; and (3) wrongly concluded that that § 922(g)(3) is consistent with this Nation's historical tradition of firearm regulation.[30] After a *de novo* review of the R&R, Endsley's objections, and the record, the Court agrees with the Magistrate Judge's recommendation to deny the Motion. The Court addresses each of Endsley's objections in turn.

A. *The Magistrate Judge Appropriately Considered the Supreme Court's Dicta in* Heller, McDonald, *and* Bruen

Endsley first objects that the Magistrate Judge improperly relied on the Supreme Court's statement in *District of Columbia v. Heller*[31] that nothing in that opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."[32]

---

[27] *Thomas v. Arn*, 474 U.S. 140, 149–50 (1985) (quoting 28 U.S.C. § 636(b)(1)) (internal quotation marks omitted); *see also* Fed. R. Crim. P. 59(b)(3).
[28] 28 U.S.C. § 636(b)(1)(C).
[29] *See id.*; *Reyna-Tapia*, 328 F.3d at 1121–22 ("[T]he district judge must review the magistrate judge's findings and recommendations *de novo* if objection is made, but not otherwise." (emphasis removed)).
[30] Dkt. 160.
[31] 554 U.S. 570 (2008).
[32] *Id.* at 626–27 & 627 n.26; Dkt. 160 at 2.

5

Endsley suggests that this clarification is dicta that should not be given significant weight because it was not supported by the historical analysis that *Bruen* now requires.[33]

Although *Bruen* created a new standard to evaluate whether modern firearms regulations comport with the Second Amendment, the Supreme Court did not question the constitutionality of regulations disarming felons and the mentally ill. To the contrary, "six of the nine Justices pointed out that *Bruen* was not casting any doubt on this language in *Heller*."[34] And though the majority opinion in *Bruen* did not address this particular issue, the majority was careful to emphasize that its holding was "in keeping with *Heller*."[35] Moreover, in *McDonald v. City of Chicago*,[36] a plurality of the Supreme Court "repeat[ed] [its previous] assurances" that *Heller*'s holding "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill."[37] Endsley is correct that the language from *Heller* at issue is dicta, but the fact that numerous members of the Supreme Court have taken pains to reiterate it

---

[33] Dkt. 160 at 2.
[34] *Vincent v. Garland*, No. 21-4121, — F. 4th —, 2023 WL 5988299, at *3 (10th Cir. 2023) (citing *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *Bruen*, 142 S. Ct. at 2189 (Breyer, J., dissenting, joined by Sotomayor & Kagan, JJ.)).
[35] *See Bruen*, 142 S. Ct. at 2126. The *Bruen* majority did, however, address *Heller*'s reference to another type of "longstanding" regulation: "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 2133. The majority indicated that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* The majority then stated that it could therefore "assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* Relying on this assumption, "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry[ing] of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* This analysis offers some potential guidance with respect to how courts should evaluate modern-day firearm regulations that resemble the other types of "longstanding" regulations first mentioned in *Heller*.
[36] 561 U.S. 742 (2010).
[37] *Id.* at 786 (internal quotation marks omitted).

in the years since renders it the kind of "considered" dicta that must be treated "with greater weight and deference."[38]

This Court is persuaded that the R&R gives proper weight to the statement originating from *Heller*. It is worth noting that the Magistrate Judge's analysis contains only limited references to this language,[39] and that the Magistrate Judge faithfully applied *Bruen*'s text-and-history test in evaluating the constitutionality of § 922(g)(3). The recommendation to deny the Motion is based not on the *Heller* dicta, but rather on the conclusion that the Government met its burden under the *Bruen* test's second prong to show that § 922(g)(3) is consistent with a historical tradition of firearm regulation. The Court therefore rejects Endsley's objection on this point.

### B. Section 922(g)(3) Does Not Impose a Permanent Ban On Firearm Possession

Endsley next objects to the Magistrate Judge's conclusion that § 922(g)(3) is constitutional notwithstanding the lack of evidence of historical laws "justifying the permanent disenfranchisement of the mentally ill from owning firearms."[40] First, Endsley argues that § 922(g)(3) cannot be fairly analogized to the founding-era practice of involuntarily committing dangerous "lunatics" because any such practice did not involve a permanent ban on firearms possession.[41] Endsley points to the Third Circuit's *en banc* decision in *Range*, arguing that decision is instructive because it recognizes that there were no founding-era laws that permanently restricted certain classes of individuals from possessing firearms.[42] Instead, Endsley asserts, "any disenfranchisement of [that] right . . . was [only] temporary and rectified when circumstances change[d]."[43]

---

[38] *Valladolid v. Pac. Operations Offshore, LLP*, 604 F.3d 1126, 1131 (9th Cir. 2010).
[39] *See* Dkt. 154 at 29.
[40] *See* Dkt. 160 at 2–6.
[41] *Id.* at 2–4.
[42] *Id.* at 3–4.
[43] *Id.* at 4.

This objection is misplaced because it relies on the premise that § 922(g)(3) permanently disarms the mentally ill.[44] As the Government notes, § 922(g)(3) imposes a far less restrictive burden. The statute allows "an unlawful drug user [to] regain his right to possess a firearm simply by ending his drug abuse."[45] For this reason, the Ninth Circuit has observed that § 922(g)(3) is "far less onerous" than, for instance, the "presumptively lawful" modern-day regulations that impose a lifetime ban on firearm possession by felons or the mentally ill.[46] Therefore, though the Government carries the burden at the second step of the *Bruen* inquiry, it need not show a historical tradition of permanently disarming the mentally ill. Instead, § 922(g)(3) may pass constitutional muster with evidence of less restrictive—or less specific—historical firearm regulations.[47] Consequently, the Court rejects Endsley's objection on this point.

   C. *The Magistrate Judge Properly Concluded that § 922(g)(3) is Consistent with This Nation's Historical Tradition of Firearm Regulation*

Endsley further argues that the rationale for temporarily disarming lunatics at the founding does not extend to disarming him as a daily user of heroin or methamphetamine.[48] During his interrogation, Endsley admitted to ingesting half a gram a day of these drugs and the interrogating officer observed that Endsley presented as a long-time drug user.[49] Based on this information, the Magistrate Judge determined that Endsley's use of these temporarily "mind-altering substances"

---

[44] *See* Dkt. 164 at 5.
[45] *United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011).
[46] *Id.*; *Heller*, 554 U.S. at 627 n.26.
[47] As the Magistrate Judge noted, civil confinement "first impl[ies] the disarmament of firearms," and this deprivation of property was not viewed as necessarily permanent in the founding era: lunatics could reclaim property after showing "restored reason." Dkt. 154 at 27, 30. Section 922(g)(3) similarly affects only a limited subset of the population and contemplates a way for individuals to regain the right to possess firearms.
[48] Dkt. 160 at 4.
[49] Dkt. 154 at 30.

was current and "operated in a habitual and continuous manner."[50] Because "[h]eroin and methamphetamine are substances that can temporarily deprive a . . . user of his ability to reason or lose 'the power of self-control,'" the Magistrate Judge concluded, the justification for disarming Endsley is similar to the founding-era justification for disarming dangerous lunatics, who were defined as those who had "lost the use of [their] reason."[51] Endsley argues that this conclusion "conflat[es] drug use with mental health issues" and cannot stand without evidence that the effects of the two are similar.[52]

The Court agrees with the Magistrate Judge that the practice of involuntarily committing lunatics shares some key features with § 922(g)(3). Most notably, to the extent that the practice of involuntarily committing and thus disarming lunatics was focused on those deemed to be dangerous, both that practice and § 922(g)(3) are a part of this Nation's well-established historical tradition of "banning dangerous people from possessing guns."[53] As the Court has previously explained, governments "may restrict firearm possession to groups viewed as dangerous in modern times, not only to those viewed as dangerous in 1791."[54] Although a government cannot satisfy its burden under *Bruen*'s second step by "simply posit[ing] that the [challenged] regulation promotes an important interest,"[55] the justification for the regulation plays a key role in determining whether the regulation sufficiently resembles a proffered historical analogue.[56]

---

[50] *Id.*
[51] *Id.* at 27, 30.
[52] *Id.* at 4–5.
[53] *United States v. Padgett*, No. 3:21-cr-00107-TMB-KFR, 2023 WL 2987935, at *9 (D. Alaska Apr. 18, 2023) (quoting *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111).
[54] *Id.*
[55] *See Bruen*, 142 S. Ct. at 2126.
[56] *See id.* at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense *and whether that burden is comparably justified* are 'central

Here, Congress enacted the original version of § 922(g)(3) as part of the Gun Control Act of 1968, which was a broad effort to "keep firearms away" from certain groups of people "classified as potentially irresponsible and dangerous."[57] During congressional debate on the bill, the House Manager proclaimed that "[n]o one can dispute the need to prevent drug addicts . . . from buying, owning, or possessing firearms" in order to "reduc[e] the danger of crime" and protect society from "firearms misuse."[58] These threats are heightened in the context of unlawful drug users because, generally speaking, individuals in this class are more likely to "have difficulty exercising self-control."[59] In sum, the very real risk to public safety posed by the combination of unlawful drug use and firearms was evidently a primary motivation behind Congress's enactment of § 922(g)(3). This motivation aligns with this Nation's historical tradition of banning dangerous people from possessing guns.

Because the Government has met its burden to demonstrate that § 922(g)(3) is consistent with this Nation's historical tradition of firearm regulation, the Court rejects Endsley's objection on this point.

---

considerations' when engaging in an analogical inquiry." (quoting *McDonald*, 561 U.S. at 767) (internal quotation marks omitted)).

[57] *Barrett v. United States*, 423 U.S. 212, 218 (1976); *see also Lewis v. United States*, 445 U.S. 55, 64 (1980) (observing that § 922(g) "prohibits categories of presumptively dangerous persons from transporting or receiving firearms"). Section 922(g)(3) originally provided that "[i]t shall be unlawful for any person . . . who is an unlawful user of or addicted to marihuana or any depressant or stimulant drug . . . or narcotic drug . . . to ship or transport any firearm or ammunition in interstate or foreign commerce." Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220 (1968).

[58] *See Huddleston v. United States*, 415 U.S. 814, 828 (1974) (quoting 114 CONG. REC. 21784 (1968) (statement of Rep. Emanuel Celler)).

[59] *See Dugan*, 657 F.3d at 999; *see also* 21 U.S.C. § 802(1) (defining an "addict" as an individual who "habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction").

## IV. CONCLUSION

The Court concludes that the Magistrate Judge correctly determined that 18 U.S.C. § 922(g)(3) is not unconstitutional as applied to Endsley. Accordingly, the Court **ACCEPTS and ADOPTS** the R&R at Docket 154 and **DENIES** the Motion at Docket 84.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 5th day of October, 2023.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE